# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| HUB GROUP, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 2024-0471-SG |
| | ) |
| CHRISTOPHER KNOLL, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Date Submitted:  June 26, 2024
Date Decided:  July 18, 2024

John A. Sensing, Tyler E. Cragg, and Hannah L. Paxton, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorneys for Plaintiff*.

Steven J. Fineman, Travis S. Hunter, Alexandra M. Ewing, and Morgan R. Harrison, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Defendant*.

**GLASSCOCK, Vice Chancellor**

Delaware, as has been stated in numerous opinions of this Court, is a contractarian jurisdiction. By this is meant the fact that our courts recognize that value inheres in holding contracting parties to their promises and enforcing their reasonable expectations. Preventing consensual parties from entering agreements, or deeming those agreements as promises that will not be enforced at law, conversely, would be, generally speaking, not value-enhancing. Again, speaking generally, "[o]nly a strong showing that dishonoring a contract is required to vindicate a public policy even stronger than freedom of contract will induce our courts to ignore unambiguous contractual undertakings."[1]

Describing this jurisdiction as contractarian, however, and evincing a willingness to generally hold contracting parties to their bargains, "good, indifferent or bad,"[2] does not mean that upholding contracts is the only value recognized by this court. Among these other considerations are the encouragement of competition and discouragement of restraints on trade, the recognition of an individual's right to choose her employment, and the desire to avoid oppressive or unclear obligations arising from contracts of adhesion.[3]

---

[1] *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 676–77 (Del. 2024) (alterations and internal quotations omitted).
[2] *Base Optics Inc. v. Liu*, 2015 WL 3491495, at *24 (Del. Ch. May 29, 2015).
[3] *FP UC Hldgs., LLC v. Hamilton*, 2020 WL 1492783, at *6 (Del. Ch. Mar. 27, 2020); *see also Norton Petroleum Corp. v. Cameron*, 1998 WL 118198, at *3 (Del. Ch. Mar. 5, 1998).

1

These various interests often conflict in cases where an employee, in consideration of future employment, is compelled to enter a contract not to compete. Where such a contract is clear, reasonable in scope and necessary to the legitimate interests of the employer, generally the public policy of enforcing contracts predominates. Where the obligations are unclear or overbroad, not so. And, as a matter of policy, such contracts of adhesion may not be modified by the Court to save their enforceability, lest a perverse incentive towards over-breadth or lack of clarity be created.[4]

This case presents for enforcement a non-competition agreement that applies to nearly every county in the United States, and to foreign countries. The language, which was supplied by Plaintiff, Hub Group, Inc. ("Hub"), the former employer of Defendant, is confusing, and not even Hub's representative could, with clarity, explain its scope.[5]

The matter is before me on Hub's motion for a Preliminary Injunction. It seeks to enjoin Defendant, Christopher Knoll, from working for a subsequent employer in a manner that Plaintiff maintains is prohibited by the Non-Compete.

---

[4] *See, e.g., Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 753–54 (Del. Ch. 2023).

[5] *See, e.g.,* Transmittal Aff. of John A. Sensing Supp. Pl.'s Opening Br. Supp. Mot. for Prelim. Inj. ("Sensing Aff."), Ex. 3 at 79:1–17, 80:18–81:16, Dkt. No. 46 ("Alexander Dep.") (Hub representative unable to articulate what business is conducted by five entities included in the definition of "Hub" in non-compete); *id.* at 438:6–16 (Hub representative acknowledging that Knoll cannot provide any form of work for any competing business in North America); *id.* at 441:7–443:20 (Hub representative acknowledging that Knoll could disclose Confidential Information in any capacity at any job, even if he is driving a forklift for a competitor).

2

Because I determine that it is likely that Plaintiff will be unable to carry its burden of proof after a trial on the merits, I must decline to enjoin Knoll's current employment.

My reasoning follows.

## I. BACKGROUND

*A. Factual Background*[6]

### 1. The Parties

Plaintiff Hub Group, Inc. ("Plaintiff" or "Hub") is a Delaware corporation with its principal place of business located in Oak Brook, Illinois.[7] Hub offers transportation and logistics management services.[8]

Defendant Christopher Knoll ("Defendant") is a Michigan resident and former Hub employee.[9]

Non-party Logistics Insight Corp. ("Linc") is a wholly-owned logistics operating subsidiary of Universal Logistics Holding, Inc. ("Universal").[10]

---

[6] The facts in this Memorandum Opinion are limited to those necessary for my analysis. They represent the existing preliminary record including that created at an evidentiary hearing in support of the preliminary injunction request.

[7] Verified Compl. ¶ 8, Dkt. No. 1 ("Compl.").

[8] Compl. ¶ 13.

[9] Compl. ¶¶ 9, 29.

[10] Compl. ¶ 30.

Non-party Universal is a publicly traded logistics company that operates exclusively through its wholly owned operating subsidiaries.[11]

### 2. Knoll's Employment with Hub

Knoll began working for Hub in February 2018 as Vice President of Automotive Solutions.[12]  In that role, Knoll led accountant management for Hub's automotive customers.[13]  Hub assigned Knoll to lead a team that provided customer service for Hub's automotive customers.[14]  He also was responsible for sales in the automotive vertical;[15] his responsibilities ranged from garnering new customers to growing business with existing automotive customers.[16]  A year after he began working for Hub, Knoll executed a non-compete and non-solicitation agreement.[17]

In 2021, Hub expanded Knoll's responsibilities to include logistics and managing transportation for end customers.[18]  That same year, Knoll executed a non-competition, non-solicitation, and confidentiality agreement.[19]  The agreement was not negotiated; it came from Hub, and Knoll's continued employment was

---

[11] Compl. ¶ 31.
[12] Sensing Aff., Ex. 1 at 21:5–14, Dkt. No. 46 ("Knoll Dep.").
[13] *Id.* at 23:24–24:4.
[14] *Id.* at 24:9–11.
[15] In this context, vertical is defined as "a market consisting of businesses that supply products and services to each other." *Vertical*, CAMBRIDGE UNIV. DICTIONARY ONLINE, https://dictionary.cambridge.org/us/dictionary/english/vertical (last visited July 15, 2024).
[16] Knoll Dep. 24:15–22.
[17] Transmittal Aff. of Alexandra M. Ewing Supp. Def.'s Answering Br. Opp'n Pl.'s Mot. for a Prelim. Inj. ("Ewing Aff."), Ex. 2, Dkt. No. 54.
[18] Knoll Dep. 26:17–27:12.
[19] Ewing Aff., Ex. 3.

4

conditional upon his entry into the agreement.[20]  Again, in 2023, Hub expanded

Knoll's responsibilities by tasking Knoll with account management for intermodal[21]

services in Mexico.[22]  Throughout his time as the Vice President of Automotive

Solutions, the Hub primarily provided intermodal, transportation, and truckload

transportation services to its automotive customers.[23]  As such, Knoll spent most of

his time selling intermodal  and truckload services.[24]  To a lesser extent, Knoll also

sold freight-forwarding, warehousing, cross-docking, and consolidation services,

although he did not actively do so.[25]

In February 2024, Knoll became Senior Vice President of Account

Management.[26]  Commensurate with his change of title, Hub increased Knoll's

salary, bonus target, and annual restricted stock award.[27]  Knoll also executed

another non-competition, non-solicitation, and confidentiality agreement (the

---

[20] *See* Ewing Aff., Ex. 24 at 211:8–15, 216:13–16, Dkt. No. 54 (Hub representative testimony in *Hub Group Inc. v. Resendiz, et al.*, C.A. No. 2022-0793-SG, stating that "if [Hub] ultimately had people who didn't sign [new non-competition, non-solicitation, and confidentiality agreements], they were making a decision that they were going to end their employment at Hub."); *see also* Tr. of 6-26-2024 Evid. Hr'g and Oral Arg. on Pl.'s Mot. for Prelim. Inj. 85:14–18, Dkt. No. 64 (Knoll testifying that he understood refusal to sign the 2021 agreement would result in his unemployment).

[21] Intermodal means "being or involving transportation by more than one form of carrier during a single journey." *Intermodal*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/intermodal (last visited July 15, 2024).

[22] Knoll Dep. 74:21–75:2.

[23] *Id.* at 30:18–31:7.

[24] *Id.* at 52:23–53:13, 64:21–65:1, 82:24–83:9.

[25] *Id.* at 55:16–57:24.

[26] *Id.* at 99:1–5.

[27] Alexander Dep. 324:10–17.  Knoll disputes Hub's assertion that his net compensation increased, however.

"Agreement").[28] According to Knoll, this was identical to the agreement that he was compelled to sign in 2021.[29] Again, this was not a negotiated agreement, and Knoll's continued employment was conditioned on his agreement. Knoll became responsible for all account management across all Hub customer verticals.[30] Throughout his time at Hub, Knoll would receive weekly updates from the Hub employees on his team that he supervised, which he aggregated into an email to send to his boss describing updates on Hub's customer accounts.[31]

### 3. The Agreement's Restrictive Covenants

The Agreement, which Knoll signed in February 2024 in connection with his new role as Senior Vice President of Account Management, contains three separate restrictive covenant obligations: (1) non-competition (the "Non-Compete"), (2) non-solicitation (the "Non-Solicit"), both for "Protected Contacts" and for Hub employees and contractors; and (3) confidentiality ("Confidentiality" and, collectively with the Non-Compete and Non-Solicit, the "Restrictive Covenants").[32] Section 4 is entitled, "Covenant Not to Compete," and provides, in relevant part:

> During Employee's employment with Hub and for a period of one (1) year after the end of Employee's employment with Hub, Employee will

---

[28] Sensing Aff., Ex. 5, Dkt. No. 46 (the "Agreement"). The Agreement states that it is governed by Delaware law. *Id.* § 11(a)(i). Neither party has advocated for the application of another state's laws to the Agreement. For the sake of deciding this motion for a preliminary injunction, I apply Delaware law.
[29] Def.'s AB 14.
[30] Alexander Dep. 101:13–20, 200:6–13.
[31] *See, e.g.*, Sensing Aff., Exs. 8–20, Dkt. No. 46.
[32] Agreement §§ 3–6.

6

not, in the Restricted Territory, directly or indirectly, manage, be employed by, or otherwise render services (whether as an employee, agent, partner, independent contractor, advisor or consultant) to any Competing Business: (a) in a capacity relating to the provision, management, development, manufacture, marketing, sales, or operation of any Competing Services; (b) in a position with responsibilities similar to those Employee had with Hub at any time during the three (3) years preceding the end of Employee's employment with Hub, or (c) in a capacity in which Employee could disclose or use Confidential Information.[33]

The Agreement provides definitions for the terms, *inter alia*, "Competing Business," "Competing Services," and "Restricted Territory."[34] "Competing Business" is defined as:

any person (including Employee), company, or entity engaged in, or about to become engaged in, the business conducted by Hub on the date Employee's employment with Hub ends or any business Hub is actively considering or was considering at any time during the one (1) year period preceding the date of the end of Employee's employment with Hub, including, without limitation:

(i) providers of intermodal, less-than-truckload, truckload, last mile, or other motor carrier freight transportation services;
(ii) providers of warehousing and freight consolidation services;
(iii) providers of third-party logistics services, including, without limitation, freight brokerage, freight forwarding, expediting, internet load boards, last-mile delivery logistics, contract logistics providers or firms;
(iv) providers of parcel and parcel management services;
(v) entities that engage in or may engage in acquisitions, mergers, and acquisition activities related to the transportation or third-party logistics industry, including, without limitation, researching, analyzing, and evaluating companies for possible investment in or acquisition of, for itself or clients; and

---

[33] Agreement § 4.
[34] *Id.* § 1.

7

(vi) Other individuals or businesses that otherwise compete with Hub anywhere in the Restricted Territory.[35]

Next, "Competing Services" is defined as:

products, processes, or services of any person or organization other than Hub, in existence or under development, that are substantially the same as, may be substituted for, or applied to substantially the same end use as, the products, processes, or services with which Employee worked at any time during the last three (3) years of Employee's employment with Hub or about which Employee possessed Confidential Information through Employee's work with Hub.[36]

Lastly, the Agreement defines "Restricted Territory" as "any geographic area in which Hub conducts business or provides products or services, including the contiguous United States."[37]

The Agreement is between Knoll and "Hub Group, Inc., and any entity that controls, is controlled by, or is under common control with Hub Group, Inc., including, without limitation, its subsidiaries, affiliates, successors, and assigns (collectively, 'Hub')."[38]   Pursuant to Section 11(b) of the Agreement, "the obligations under this Agreement shall be binding upon [Knoll] and [Knoll's] successors, heirs, executors, and representatives."[39]

---

[35] *Id.* § 1(b).
[36] *Id.* § 1(c).
[37] *Id.* § 1(h).
[38] *Id.* at 1.
[39] *Id.* § 11(b).

8

### 4. Knoll Leaves Hub

Knoll began to seek alternative opportunities the same day that he received the details about his promotion to Senior Vice President of Account Management because he considered the terms of his promotion an insult.[40] In early March 2024, a recruiter at HR-1 emailed Knoll regarding a potential role at Linc.[41] Knoll spoke with the recruiter about the scope of the potential role, which involved value added services like sequencing, metering, kitting, and warehousing-type services for Linc's automotive and aerospace customers.[42] On April 1, 2024, Knoll received a job offer from Universal.[43] Knoll was offered to either join Linc as the chief commercial officer for value-added services or as president of intermodal.[44] While Knoll was receptive to either position, he did not consider the president of intermodal position to be a feasible option since he primarily focused on intermodal while working for Hub.[45]

On April 18, 2024, Knoll spoke with Hub's Chief Operating Officer, Brian Alexander, about the job offer from Linc.[46] Shortly after the conversation with

---

[40] Knoll Dep. 99:9–10, 206:14–207:6 (explaining that, while his base pay increased with his promotion, his total compensation in his new role was lower than what he was paid the previous year, prior to the promotion).

[41] Sensing Aff., Ex. 33, Dkt. No. 47.

[42] Knoll Dep. 224:21–225:19.

[43] *Id.* at 262:1–8.

[44] *Id.* at 264:5–7, 265:10–17.

[45] *Id.* at 231:8–232:4, 265:20–266:5.

[46] *Id.* at 305:22–306:10.

Alexander, Knoll emailed him a redacted version of his offer letter from Linc.[47] After reviewing the offer letter, Alexander informed Knoll that Hub considered Universal to be a competitor and advised Knoll that Hub's legal team may become involved if Knoll were to accept the offer.[48]

Upon signing his offer letter from Linc on April 26, 2024, Knoll submitted his formal resignation letter to Alexander.[49] Along with his resignation letter, Knoll provided Hub with a signed "Agreement to Abide by Existing Restrictions" to assure Hub that Knoll would not breach the Restrictive Covenants in his new role with Linc.[50] Knoll assumed his role with Linc on April 30, 2024.[51] As the chief commercial officer of Linc, Knoll is expected to manage and maintain relationships with incumbent and target customers, set strategic directions for sales employees to maximize business awards, research and implement new sales tools to better organize data and reporting, and determine the best "go-to market approach to improve win rate."[52]

---

[47] *Id.* at 309:5–310:6; Sensing Aff., Ex. 42, Dkt. No. 47.
[48] Knoll Dep. 307:12–18; Alexander Dep. 143:2–12, 145:19–20, 146:3–13.
[49] Sensing Aff., Exs. 39, 47, Dkt. No. 47.
[50] Sensing Aff., Ex. 47.
[51] Knoll Dep. 216:24–217:2.
[52] Sensing Aff., Ex. 23 at 6, Dkt. No. 46.

*B. Procedural History*

Hub filed the operative complaint ("Complaint"), a motion seeking a temporary restraining order, and a motion to expedite proceedings on May 3, 2024.[53] The matter was expedited on May 14, 2024.[54] I granted the parties' proposed order resolving the motion seeking a temporary restraining order on May 20, 2024.[55] Effectively, Knoll has suspended his work for Linc pending the outcome of this motion for injunctive relief. Linc, meanwhile, is still paying Knoll's salary. The parties engaged in expedited discovery and Hub filed a motion seeking a preliminary injunction on June 13, 2024.[56] The motion for a preliminary injunction was fully briefed on June 24, 2024, and I heard oral argument on the motion on June 26, 2024.[57] I consider the matter submitted as of that date. To the extent that the Complaint seeks to enforce the Non-Solicit and Confidentiality restrictive covenants, I note that this preliminary injunction opinion does not decide the enforceability of those covenants against Knoll, nor does it preclude Hub from seeking relief related to those covenants in the future.

---

[53] *See* Compl.; Pl.'s Mot. for a TRO, Dkt. No. 1; Pl.'s Mot. to Expedite Proceedings, Dkt. No. 1.

[54] *See* Tr. of 5-14-2024 Hr'g on Pl.'s Mot. to Expedite and for a TRO, Dkt. No. 45.

[55] *See* Granted (Stipulation and (Proposed) Order Resolving Mot. for TRO), Dkt. No. 11.

[56] *See* Pl. Hub's Mot. for Prelim. Inj., Dkt. No. 46.

[57] *See* Pl. Hub's Reply Br. Further Supp. Mot. for Prelim. Inj., Dkt. No. 57 ("Pl.'s RB"); Judicial Action Form re Prelim. Inj. Hr'g before Vice Chancellor Sam Glasscock dated 6.26.24, Dkt. No. 60.

## II. ANALYSIS

Through its motion for a preliminary injunction, Hub seeks to enjoin Knoll from continuing his employment with Linc, Universal, or any of their affiliates, which Hub asserts violates Restrictive Covenants in the Agreement.[58]  Specifically, until final judgment in this matter, Hub seeks to enjoin Knoll from:

> [1] . . . employment as the Chief Commercial Officer of Linc, or in any capacity at Linc, Universal, or any of their affiliates[;] [2] . . . directly or indirectly[] soliciting, diverting, or encouraging (or attempting to solicit, divert, or encourage) any Hu Protected Contact . . . (a) to provide or assist in providing Competing Services . . . ; to become a customer of any Competing Business . . . ; (c) to engage or retain a Competing Business to provide Competing Services; (d) to discontinue, reduce, not conduct, or not engage in business with Hub; or (e) to otherwise impede or interfere with the relationship between Hub and any such Protected Contact[;] [3] . . . directly or indirectly[] soliciting or encouraging any employee of Hub to terminate, limit, or reduce their employment status with Hub, or otherwise interfering with the performance by Hub employees of their obligations or responsibilities with Hub[; and] [4] the use or disclosure of any Hub Confidential Information[.][59]

Knoll contends that the Agreement is unenforceable and, therefore, the Court cannot grant the preliminary injunction.[60]  At oral argument, the parties agreed that whether Hub's request for a preliminary injunction is granted hinges on the enforceability of the Non-Compete.  Accordingly, I limit my analysis to that issue. Below, I have set out the Non-Compete, in relevant part, with all defined terms

---

[58] Hub's Opening Br. Supp. Mot. for Prelim. Inj. 37, Dkt. No. 46 ("Pl.'s OB"); *see also* (Proposed) Order to Pl. Hub's Mot. for a Prelim. Inj. ¶ 2, Dkt. No. 46.
[59] *See* (Proposed) Order to Pl. Hub Gp., Inc.'s Mot. for Prelim. Inj. ¶¶ 2–5, Dkt. No. 46.
[60] Def. Knoll's Answering Br. Opp'n Pl.'s Mot. for a Prelim. Inj. 23–50, Dkt. No. 53 ("Def.'s AB").

replaced with their full definition, to give the reader the flavor of what Hub employees were being asked to agree:

> During [Knoll's] employment with Hub [defined as "Hub Group, Inc., and any entity that controls, is controlled by, or is under common control with Hub Group, Inc., including, without limitation, its subsidiaries, affiliates, successors, and assigns" (*i.e.*, 25 entities located in various states in the United States, Canada, Mexico, and India)] and for a period of one (1) year after the end of [Knoll's] employment with Hub, [Knoll] will not, in the Restricted Territory [defined as "any geographic area in which Hub conducts business or provides products or services, including the contiguous United States" (*i.e.*, more than 42,000 zip codes in the United States)], directly or indirectly, manage, be employed by, or otherwise render services (whether as an employee, agent, partner, independent contractor, advisor or consultant) to any Competing Business [defined as "any person (including [Knoll]), company, or entity engaged in, or about to become engaged in, the business conducted by Hub on the date [Knoll]'s employment with Hub ends or any business Hub is actively considering or was considering at any time during the one (1) year period preceding the date of the end of [Knoll's] employment with Hub, without limitation: (i) providers of intermodal, less-than-truckload, truckload, last mile, or other motor carrier freight transportation services; (ii) providers of warehousing and freight consolidation services; (iii) providers of third-party logistics services, including, without limitation, freight brokerage, freight forwarding, expediting, internet load boards, last-mile delivery logistics, contract logistics providers or firms; (iv) providers of parcel and parcel management services; (v) entities that engage in or may engage in acquisitions, mergers, and acquisition activities related to the transportation or third-party logistics industry, including, without limitation, researching, analyzing, and evaluating companies for possible investment in or acquisition of, for itself or clients; and (vi) [o]ther individuals or businesses that otherwise compete with Hub anywhere in the Restricted Territory"]: (a) in a capacity relating to the provision, management, development, manufacture, marketing, sales, or operation of any [products, processes, or services of any person or organization other than Hub, in existence or under development, that are substantially the same as, may be substituted for, or applied to substantially the same end use as, the products, processes, or services

13

with which [Knoll] worked at any time during the last three (3) years of [Knoll's] employment with Hub or about which [Knoll] possessed Confidential Information [defined as "information relating to the present or planned business of Hub that has not been released publicly by authorized representatives of Hub. . . includ[ing] Hub's trade secrets as defined under federal and state law, inventions, and any other information or material that is not generally known by the public and that (i) is generated in, collected by, or utilized in Hub's operations and relates to the actual or anticipated business, research, or development of Hub, or (ii) is suggested by, or results from, any task assigned to [Knoll] by Hub or any work performed by [Knoll] for or on behalf of Hub, in all cases whether existing in hard copy, electronic format, or in [Knoll's] mind or in any derivations, copy, or notes made from any item embodying Confidential Information. Confidential Information also includes all information received by Hub under an obligation of confidentiality to a third party, including, without limitation, Hub's customers, carriers, and other business relationships. Examples of Confidential Information include, but are not limited to, customer and carrier lists, information, and contracts; the identity of suppliers, including contacts, cost, capacity and products and services; financial data, pricing strategies, sales, costs, pricing, margins, load data, lane volumes; compensation and workforce information and strategies; customers plans and strategies; business plans and strategies; regulatory strategies; marketing and sales plans, programs, processes, and practices; information technology, technical know-how, formulae, processes, designs, prototypes, models, software, solutions, research and development; personnel information; competitor information; and any other information that [Knoll] obtains from Hub that could reasonably be expected to be deleterious to Hub if disclosed to third parties. The foregoing list is not exhaustive and Confidential Information also includes other information that would otherwise appear to a reasonable person to be confidential or proprietary in the context in which the information is known or used"]; (b) in a position with responsibilities similar to those [Knoll] had with Hub at any time during the three (3) years preceding the end of [Knoll's] employment with Hub, or (c) in a capacity in which [Knoll] could disclose or use Confidential Information.[61]

---

[61] Agreement § 4 (quoting Agreement at 1, § 1(a), 1(b), 1(c), 1(h)).

As Vice Chancellor Laster dryly described another employee non-compete, with unbeatable pithiness: "That is a pile of words."[62]  Indeed.

*A. Standard of Review*

Preliminary injunctive relief is appropriate "when the moving party can demonstrate (1) a reasonable probability of success on the merits, (2) irreparable harm will occur in the absence of an injunction, and (3) the balance of the equities weighs in favor of granting the injunction."[63]  "The party seeking a preliminary injunction must demonstrate all three elements to prevail . . . ."[64]

In the Complaint, Hub asserts a count for breach of contract concerning the Restrictive Covenants in the Agreement.[65]  Accordingly, Hub must establish a reasonable likelihood of success that, at trial, Hub will be able to prove by a preponderance of the evidence the existence of: "(i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance."[66]  "Restrictive covenants are enforceable when they are (i) valid under general principles of law, (ii) are reasonable in their scope and effect, (iii) bear

---

[62] *Sunder Energy*, 305 A.3d at 757.
[63] *Simplexity, LLC v. Zeinfeld*, 2013 WL 1457726, at *6 (Del. Ch. Apr. 5, 2013).
[64] *Sunder Energy*, 305 A.3d at 745 (internal quotations omitted).
[65] Compl. ¶¶ 60–69.
[66] *Sunder Energy*, 305 A.3d at 746 (citation omitted)

15

a reasonable relationship to the advance of legitimate interests, and (iv) survive a balancing of the equities."[67]

While Delaware is a contractarian state, "Delaware courts do not 'mechanically' enforce non-competes."[68] Rather, non-competes are reviewed to ensure they "(1) [are] reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities."[69] This review occurs because "Delaware courts [] favor the public interest of competition[.]"[70] To determine whether a non-compete is reasonable, "the [C]ourt focuses on whether the non-compete is 'essential for the protection of the employer's interests.'"[71] Delaware courts also acknowledge "the imbalances in bargaining power and repeat-player experience that exist between businesses and individuals."[72] Next, the Court "balances the employer's interests against the employee's interests."[73] This Court "will not enforce a non-compete if, on balance, to do so would impose an unusual hardship on a former employee."[74]

---

[67] *Id.*

[68] *FP UC Hldgs.*, 2020 WL 1492783, at *6 (quoting *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch. 1987)).

[69] *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *5 (Del. Ch. Sept. 28, 2018).

[70] *Elite Cleaning Co., Inc. v. Capel*, 2006 WL 1565161, at *4 (Del. Ch. June 2, 2005).

[71] *FP UC Hldgs.*, 2020 WL 1492783, at *6 (quoting *Norton*, 1998 WL 118198, at *3).

[72] *Sunder Energy*, 305 A.3d at 753.

[73] *FP UC Hldgs.*, 2020 WL 1492783, at *6.

[74] *Id.* (alterations and internal quotations omitted).

16

Hub, for its part, argues that such scrutiny of non-competes has recently been rejected by our Supreme Court, in *Cantor Fitzgerald, L.P. v. Ainslie*.[75] I read *Ainslie* differently, however. *Ainslie* is not an employee non-compete case. As the *Ainslie* Court explicitly notes, the court below had "reasoned that, unlike ordinary contract provisions, forfeiture-for-competition provisions should be subject—*much like restrictive employment covenants are*—to scrutiny for reasonableness."[76] The Supreme Court disagreed with bringing that employee non-compete scrutiny into a forfeiture-for-competition limited partnership case. "[W]e balance the relevant policy interests differently. When sophisticated actors avail themselves of the contractual flexibility in the [DRULPA] . . . and agree that a departing partner will forfeit a specified benefit should he engage in competition, our courts should, absent . . . extraordinary circumstances, hold them to their agreement."[77]

Knoll contends that his Non-Compete is unenforceable because its scope is overbroad and unreasonable for four reasons.[78] First, the Non-Compete includes entities and geographic locations that Knoll had no responsibility for during his tenure for Hub, and prohibits post-employment competition with Hub entities for which neither Knoll *nor Hub* can explain the business they pursue.[79] Second, Knoll

---

[75] Pl.'s RB 16–17.
[76] *Ainslie*, 312 A.3d at 677.
[77] *Id.*
[78] Def.'s AB 27–50.
[79] *Id.* at 29–32; *see also* Alexander Dep. 79:1–17, 80:18–81:16.

17

contends the Agreement's definition of "Restricted Territory" is too amorphous and ill-defined to be enforceable.[80] Third, the definition of "Competing Business" is so broad that it precludes Knoll from any gainful employment while not protecting Hub's legitimate business interests.[81] Lastly, Knoll asserts that the Agreement imposes obligations that do not serve a legitimate business interest for Hub.[82]

In response, Hub asks that the Non-Compete be viewed "holistically" to understand how it and each defined term referred to therein are tethered to Knoll's duties at Hub.[83] Particularly, Hub posits that the defined terms "Hub," "Restricted Territory," and "Competing Business" are modified by what Hub characterizes as three limitations in the Non-Compete.[84] Hub also asserts that it has a legitimate economic interest that makes the geographic scope reasonable.[85] To the extent that the Non-Compete is broad, Hub argues that it is a function of Knoll's wide-ranging responsibilities as a senior leader at Hub.[86]

### B. The Non-Compete Covenant is Unenforceable

To determine the reasonableness of the Non-Compete, the Court must read the contractual language as a whole, in the context of the employment relationship.[87]

---

[80] Def.'s AB 32–37.
[81] *Id.* at 37–49.
[82] *Id.* at 49–50.
[83] Pl.'s RB 9–10.
[84] *Id.* at 10–11.
[85] *Id.* at 17–19.
[86] *Id.* at 22–23.
[87] *See Sunder Energy*, 305 A.3d at 753.

This requires the Court "evaluat[e] all of the dimensions of the restrictive covenant and consider[] how it operates with other restrictions in the contract."[88]

The Non-Compete that Hub wishes to enforce reads, in relevant part, as follows:

> During Employee's employment with Hub and for a period of one (1) year after the end of Employee's employment with Hub, Employee will not, in the Restricted Territory, directly or indirectly, manage, be employed by, or otherwise render services (whether as an employee, agent, partner, independent contractor, advisor or consultant) to any Competing Business: (a) in a capacity relating to the provision, management, development, manufacture, marketing, sales, or operation of any Competing Services; (b) in a position with responsibilities similar to those Employee had with Hub at any time during the three (3) years preceding the end of Employee's employment with Hub, or (c) in a capacity in which Employee could disclose or use Confidential Information.[89]

Before turning to the three limitations that Hub contends tailor this Non-Compete in such a way as to make the Non-Compete reasonable, I must consider the general clause of the Non-Compete (the "General Clause"). The General Clause states that, for a year following the end of his employment, Knoll is prohibited from, "in the Restricted Territory, directly or indirectly, manag[ing], be[ing] employed by or otherwise render[ing] services (whether as an employee, agent, partner, independent contractor, advisor or consultant) to any Competing Business[.]"[90]

---

[88] *Id.*
[89] Agreement § 4.
[90] *Id.*

19

The term "Restricted Territory" is defined as "any geographic area in which Hub conducts business or provides products or services, including the contiguous United States."[91] The definition of "Hub" includes not only Hub Group, Inc., but also "any entity that controls, is controlled by, or is under common control with Hub Group, Inc, including, without limitation, its subsidiaries, affiliates, successors, and assigns[.]"[92] According to Hub, this definition covers 25 entities in various states in the United States, Canada, Mexico, and India.[93] In the United States, Hub states that it conducts business in over 42,000 zip codes because Hub picks up and delivers in, as well as has routes that traverse, these zip codes.[94] The zip codes in which Hub conducts business are subject to change on a day-to-day basis.[95] Given the current state of the record, it is reasonable to assume that the restrictions apply at least to the contiguous United States as a whole.

The definition of "Competing Business" includes, in relevant part, "any person (including Employee), company, or entity engaged in, or about to become engaged in, the business conducted by Hub on the date Employee's employment with Hub ends or any business Hub is actively considering or was considering" in the year "preceding the date of the end of Employee's employment with Hub[.]"[96]

---

[91] *Id.* § 1(h).
[92] *Id.* at 1.
[93] Ewing Aff., Ex. 4, Ex. A, Dkt. No. 54.
[94] Alexander Dep. 362:22–369:24; Ewing Aff., Ex. 22 at 109:11–110:14; *see also* Pl.'s OB 8.
[95] Alexander Dep. 357:23–358:4.
[96] Agreement § 1(b).

The Agreement clarifies that this definition "include[s], without limitation: . . . Other individuals or businesses that otherwise compete with Hub anywhere in the Restricted Territory."[97]  Like the definition of Restrict Territory, "Competing Business" invokes the definition of "Hub," which includes 25 entities in four different countries.  While the term includes "business[es] that otherwise compete with Hub," Hub could not articulate or describe what business was conducted by at least five of the Hub entities included in this definition.[98]

As Knoll points out, the General Clause, when read in isolation, is not tailored to Knoll's role while employed at Hub Group, Inc.  By its plain terms, the General Clause purports to prevent Knoll from working for an entity that competes with any of 25 Hub entities located in four countries.  This prohibition extends to entities not yet competing with any Hub entity but planning to conduct business one day that *may* compete with a Hub entity.[99]  The geographical scope of the General Clause is, effectively, unlimited in the United States.[100]  Clearly, if the General Clause were read in isolation, it would be a near-uncabined prohibition on employment, and not essential to the protection of Hub's legitimate business functions.  In other words,

---

[97] *Id.* § 1(b)(vi).
[98] *See* Alexander Dep. 79:1–17, 80:18–81:16.
[99] *Cf. Centurion Serv. Gp., LLC v. Wilensky*, 2023 WL 5624156, at *4 (Del. Ch. Aug. 31, 2023) (explaining that a noncompete that defined "area" to include where the employer was "actively planning to solicit and engage in" business was "amorphous and ill-defined") (citation omitted).
[100]*See FP UC Hldgs.*, 2020 WL 1492783, at *7 (finding that the broader the scope, the greater the business interest necessary to its enforcement, and noting that nation-wide geographic scope had not been found enforceable outside the context of the sale of a business).

the General Clause, standing alone, would be unenforceable. Hub does not, I think it is fair to say, contend otherwise. However, the General Clause cannot be read in isolation.[101] According to Hub, the entirety of the Non-Compete is narrowly tailored to Knoll's duties and responsibilities at Hub because the Non-Compete contains three limiting requirements.[102] These limitations prevent Knoll from working:

> (a) in a capacity relating to the provision, management, development, manufacture, marketing, sales, or operation of any Competing Services; (b) in a position with responsibilities similar to those Employee had with Hub at any time during the three (3) years preceding the end of Employee's employment with Hub, *or* (c) in a capacity in which Employee could disclose or use Confidential Information.[103]

To paraphrase Hub's argument, Knoll is broadly prohibited from working in the United States and other countries for any company that does business in a way that competes with any of twenty-five Hub entities, but *only if* (1) his employment involves the same service he provided to Hub, or (2) he occupies an equivalent position with his new employer as he had at Hub, or (3) he accepts a position where he would be likely to disclose Hub's trade secrets. Given Knoll's role within Hub as an executive, per Hub, the restriction is sufficiently tailored to its business interests to be enforceable. I need not resolve that issue, as I do not read the language as narrowly as Hub suggests. Below, I examine each of these purported limitations

---

[101] *See Sunder Energy*, 305 A.3d at 753.
[102] Pl.'s RB 9–11, 13–14.
[103] Agreement § 4(a)–(c) (emphasis added).

22

in turn to determine if the Non-Compete is reasonable. Since these purported limitations are listed in the disjunctive, if any is overbroad, the restriction is unenforceable.

*First*, subsection (a) of the Non-Compete prohibits Knoll from working at Competing Business in the Restricted Territory "in a capacity relating to the provision, management, development, manufacture, marketing, sales or operation of any Competing Services[.]"[104] Hub contends that subsection (a) prevents Knoll from providing the same sales and account management services he provided at Hub to a competitor.[105] However, the plain terms of subsection (a) are not limited to the sales and account management services Knoll provided to Hub. Rather, the list of employment services the Non-Compete prohibits Knoll from providing a Competing Business includes "the provision, management, development, manufacture, marketing, sales, or operation of any Competing Services[.]"[106] For example, the dictionary definition of "provision" is "the act or process of providing."[107] Subsection (a) precludes Knoll from providing a Competing Business with any "Competing Services."[108] Thus, unless the definition of "Competing Services"

---

[104] *Id.* § 4(a).

[105] Pl.'s RB 13.

[106] Agreement § 4(b).

[107] *Provision*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/provision (last visited June 29, 2024).

[108] Agreement § 4(b).

limits the application of the Non-Compete in a meaningful way, the Non-Compete is overbroad.

I find that the use of "Competing Services" does not assist in limiting subsection (a). "Competing Services" is defined as:

> products, processes, or services of any person or organization other than Hub, in existence or under development, that are substantially the same as, may be substituted for, or applied to substantially the same end use as, the products, processes or services with which Employee worked at any time during the last three (3) years of Employee's employment with Hub *or* about which Employee possesses Confidential Information through Employee's work with Hub.[109]

The language "substantially the same as, may be substituted for, or applied to substantially the same end use as[] the products, processes or service with which Employee worked" is, by itself, vague and fails to provide an objective standard for Knoll to comply with.[110] In conjunction with the broad definition of "Restricted Territory," this language "exceeds any legitimate economic interests of [Hub] and would work an undue hardship on" the restricted employee.[111]

---

[109] *Id.* § 1(c) (emphasis added).
[110] *See Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *12 (Del. Ch. Oct. 23, 2002) (explaining that "the spectrum of activities prohibited by an agreement not to compete may be vague or overly broad and, therefore, not enforceable[,]" where a non-compete prevents an employee from "engag[ing] in a business 'similar to' the [employer's] business"); *Norton*, 1998 WL 118198, at *3 (finding non-compete language prohibiting employee "from working for any company whose business is 'similar to'" to the employers was "a broad, vague, and unwieldy restriction[.]").
[111] *Del. Express Shuttle*, 2002 WL 31458243, at *13.

Subsection (a) is also broad due to its reference to the second clause of Competing Services, which is further defined as the "products, processes, or services . . . about which Employee possesses Confidential Information through Employee's work with Hub."[112]  "Confidential Information," in turn, is defined to include "information relating to the present or planned business of Hub that has not been released publicly by authorized representatives of Hub."[113]  Although Hub posits that subsection (a) limits the General Clause, subsection (a) appears to prevent Knoll from providing *any* services for a Competing Business if he has *any* information related to *any* business conducted by Hub.[114]  Subsection (a) is not, as Hub contends, limited to Knoll's role and duties while employed at Hub.

*Second*, the Non-Compete precludes Knoll from working for a Competing Business in the Restricted Territory "in a position with responsibilities similar to those Employee had with Hub at any time during the three (3) years preceding the end of Employee's employment with Hub[.]"[115]  Knoll provided sales and account

---

[112] Agreement § 1(c).

[113] *Id.* § 1(a).

[114] Hub alleges that Knoll had access to vast swathes of Hub's Confidential Information because Knoll would congregate his subordinates' updates in a weekly email to send to Hub's COO.  *See* Pl's RB 19 (citing Sensing Aff., Exs. 8–21, Transmittal Aff. of John A. Sensing Supp. Pl.'s Reply Br. Further Supp. Mot. for Prelim. Inj., Exs. 63–64, Dkt. No. 57).  Knoll, however, no longer has this Confidential Information contained in these weekly emails because he has no access to his Hub email, nor does Knoll have his work equipment.  Knoll Dep. 174:21–176:14, 372:11–18.

[115] Agreement § 4(b).

management services for Hub, while supervising a team of other Hub employees who provide similar services.

Under the plain language of subsection (b), Knoll can neither supervise nor manage other individuals for any Competing Business in the Restricted Territory. It further prevents Knoll from selling *anything* for an entity that Hub believes competes with any of its 25 entities. Hub contends that Knoll's responsibilities as Linc's CCO, such as "managing and maintaining relationships with incumbent and target customers, setting strategic directions for sales employees to maximize business awards, researching and implementing new sales tools to better organize data and reporting, and determining the best go-to market approach to improve win rate[,]" are identical to the responsibilities Knoll had while employed at Hub.[116] If so, however, the *Non-Compete* is not limited to such "identical" responsibilities. Even accepting Hub's contention, Knoll would still be prevented from managing *any* customer relationships or acting in a supervisory manner by setting goals for other employees. This restriction remains so broad that it does not limit the General Clause in a manner that meaningfully protects Hub's economic interests.

Subsection (b) does not tailor the General Clause to Knoll's role at Hub, which was primarily related to selling intermodal and trucking services, as evidenced by Hub's attempt to enforce the Non-Compete against Knoll for accepting a job with

_____

[116] Pl.'s OB 49 (quoting Sensing Aff., Ex. 23 at 6).

26

Linc, which provides value added services like sequencing, metering, kitting, and warehousing-type services. Although Hub contends that subsection (b) is necessary to protect its business interests because Knoll was responsible for many of Hub's customer relationships and had access to Hub's Confidential Information, "[t]hese vague and everyday concerns do not demonstrate [the Non-Compete] is warranted by a particularly strong economic interest."[117]

*Third*, the Non-Compete also prevents Knoll from working at a Competing Business in a Restricted Territory "in a capacity in which Employee *could disclose or use* Confidential Information."[118] As noted above, the definition of Confidential Information includes all nonpublic information related to Hub.[119] While Hub asserts this subsection limits the General Clause to prevent Knoll from taking a job at a Competing Business to which he could provide useful Confidential Information, Hub concedes that "other non-competitive disclosures may run afoul of the" Non-Compete.[120] By its plain terms, Knoll is still prevented from being employed by an entity that competes with any of the 25 Hub entities in the Restricted Territory. Regardless of what role Knoll takes at the entity, if Hub considers it a "Competing Business," Knoll "*could* disclose . . . Confidential Information[]" to that entity and,

---

[117] *Centurion Serv. Gp.*, 2023 WL 5624156, at *5.
[118] Agreement § 4(c) (emphasis added).
[119] *Id.* § 1(a).
[120] Pl.'s RB 13 & n.45.

therefore, be in breach of the Non-Compete.[121] The definition of "Confidential Information" is not limited to information that Knoll had access to or utilized in his position as Senior Vice President of Account Management with Hub; it includes nonpublic information related to all 25 Hub entities.[122] As I interpret it, subsection (c) does not effectively limit the General Clause.

When the Non-Compete is read as a whole, Knoll is prohibited from working for an entity that competes with any of Hub's 25 entities, located in at least four countries and in 42,000 zip codes within the United States, if Knoll (a) does anything "substantially the same as" what he did while employed at Hub *or* if he possesses any information related to any Hub entity; (b) is in a position related to sales, customer management, setting strategic goals for sales employees, supervision of a team, or researching sales tools; *or* (c) *could* disclose any nonpublic information related to *any* business conducted by a Hub entity. This is overbroad.

The breadth of the Non-Compete, I note, is compounded by the Agreement's purported (and frankly baffling) binding effect upon Knoll and Knoll's "successors, heirs, executors, and representatives."[123]

---

[121] Agreement § 4(c) (emphasis added).

[122] *Id.* § 1(a). Hub contends that Knoll "had access to and utilized vast swathes of Hub's Confidential Information[,]" without explaining the breadth of Knoll's access to such Confidential Information with respect to other Hub entities that Knoll had no knowledge of or responsibility for. Pl.'s RB 19.

[123] Agreement § 11(b). If, say, Knoll's child were to have any Hub Confidential Information, that child would presumably be bound by the Agreement and would similarly have a difficult time securing employment that would not violate the Non-Compete because the child *could* disclose

28

Hub urges me to interpret the three "limiting provisions" in such a way that they render the whole of the Non-Compete narrowly tailored to protect Hub's interests. I agree that I am interpreting them broadly. A recognized problem in the enforcement of non-competes is the perverse incentive that a court might tailor, or limit, the effect of an overbroad non-competition agreement as to render it enforceable. That would encourage the use of overbroad non-competes; with some fraction of employees cowed into accepting unenforceably-broad restrictions, and with the Court available to blue-pencil and enforce the provision where a former and non-compliant employee is harming the legitimate interests of the company.[124] An analog of that problem is illustrated here: a non-compete so complex and difficult to parse that a broad range of conduct may be prohibited, but the entity can propose a reading that saves the provision from a finding of overbreadth. This is with respect to a contract provided by the company without negotiation, and imposed as a condition of future employment. The obvious mal-incentive, and the equitable

---

Hub's Confidential Information. Hub points to the Agreement's severability clause in Section 11(d) to excuse the overbreadth of the Non-Compete to the extent the Agreement purports to bind Knoll's successors, heirs, executors, and representatives. Pl.'s RB 16 n.52. However, I decline to blue-pencil the Agreement by severing the binding effect clause to make the Non-Compete more reasonable. *Kodiak Bldgs. P'rs, LLC v. Adams*, 2022 WL 5240507, at \*5 (Del. Ch. Oct. 6, 2022) ("Where noncompete . . . covenants are unreasonable in part, Delaware courts are hesitant to 'blue pencil' such agreements to make them reasonable").
[124]*E.g. Sunder Energy*, 305 A.3d at 753–54.

principles embodied in the doctrine of *contra proferentem,* weigh against such an interpretation here, I find.[125]

The Non-Compete is broad, and Hub has not demonstrated that the Non-Compete is necessary "to protect a 'particularly strong economic interest' from otherwise lawful competition by" Knoll or others the Agreement purports to bind.[126] Therefore, I find it improbable that Hub will be able to enforce the Non-Compete after a trial on the merits. Accordingly, I need not consider the remainder of the preliminary injunctive relief analysis to determine that equitable relief is unavailable at this preliminary stage.

### III. CONCLUSION

I find that Hub has failed to demonstrate a reasonable likelihood of success that it will be able to prove at trial that the Non-Compete is enforceable. Accordingly, the Hub's motion for a preliminary injunction is denied. The parties should submit a form of order consistent with this Memorandum Opinion.

---

[125] Here, where an employee is given a Hobb's choice to accept the contract as written by the employer, the contract language must be read in a way that is natural to the employee. *See Zimmerman v. Crothall*, 62 A.3d 676, 698 (Del. Ch. 2013) ("The rule of *contra proferentum* [sic] is . . . appropriate 'in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position'") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 206 cmt. a (Am. L. Inst. 1981); *see also Sunder Energy*, 305 A.3d at 753 (acknowledging "the imbalances in bargaining power and repeat-player experience that exist between businesses and individuals.").

[126] *Centurion Serv. Gp.*, 2023 WL 5624156, at *5.